Filed 5/3/22  In re Harmony B. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re HARMONY B., et al., Persons Coming Under Juvenile Court Law. | B311098 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20LJJP00624A-C) |
| Plaintiff and Respondent, | |
| v. | |
| BRITTANY B., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Michael C. Kelley, Judge.  Affirmed.

David M. Yorton, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Timothy M. O'Crowley, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

In January 2021, the juvenile court found jurisdiction over Harmony B. (then eight years old), Demi C. (then two years old), and Athena B. (then four months old) based on a petition filed by the Los Angeles County Department of Children and Family Services (DCFS) alleging counts under Welfare and Institutions Code section 300, subdivisions (b)(1) and (j) (Section 300(b)(1) and Section 300(j)). Specifically, the court found the children were at substantial risk of harm from appellant-mother Brittany B.'s drug abuse, her history of domestic violence with Demi and Athena's father Dominic C., and her mental health issues. At disposition, the court removed all three children from Mother, then terminated jurisdiction over Harmony, granting sole physical custody to her non-offending father N.G.

On appeal, Mother contends the court erred in assuming jurisdiction and then removing the children from her care because substantial evidence did not support a finding that she abused drugs, had a history of domestic

2

violence with Dominic, or had mental health issues, or that any of these endangered the children. She additionally argues the court erred in failing to consider alternatives to removal. Finally, she argues the court abused its discretion in granting N.G. sole physical custody of Harmony. Finding no error, we affirm.

## STATEMENT OF RELEVANT FACTS

### A. *Family Background*

Brittany B. (born in 1989) is the mother of Harmony B. (born February 2012), Demi C. (born October 2018), and Athena B. (born September 2020). N.G. is the father of Harmony, and Dominic C. is the father of Demi and Athena.[1] In June 2019, a family law court entered an order evenly splitting custody of Harmony between Mother and N.G.

In July 2018, Mother threw Dominic's headphones during an argument about Dominic's "constant disrespect" toward her; Dominic responded by pushing Mother. In April 2019, the police received a report that Dominic had thrown a water bottle at Mother, hitting her in the thigh. This led to Dominic's arrest for battery. Dominic reported that the incident also resulted in a protective order preventing him from contacting Mother.

In February 2020, DCFS received a referral for general neglect and emotional abuse, alleging that Mother was

---

[1] Neither N.G. nor Dominic is a party to this appeal.

3

abusing methamphetamine and marijuana, and also drank alcohol nightly. Mother denied the allegations. After Mother refused to participate in an on-demand drug test, DCFS closed the investigation as inconclusive due to lack of evidence.

In May 2020, Dominic was charged with violating Penal Code section 273.5, subdivision (a) (infliction of corporal injury upon the parent of the offender's child). Dominic pled no contest and was sentenced to nine days in jail and three years of probation, and ordered to enroll in a 52-week domestic violence treatment program. The court also imposed a 10-year protective order, requiring Dominic to stay away from and have no contact with Mother.

In July 2020, DCFS received another referral for general neglect. The referral alleged three incidents: In May 2020, during an argument between Mother and Dominic, Mother threw a laptop at Dominic, and Dominic punched her in the face. In June 2020, during another argument, Dominic threw an office chair at Mother, hitting her on the wrist. In July 2020, after Dominic "constantly disrespected" Mother, she threw his cell phone and he punched her. Though the last incident was referred to law enforcement, Mother refused an emergency protective order. The referral was evaluated out.[2]

---

[2] The term "evaluated out" means "the child protective services screener did not find sufficient evidence of physical abuse or child abuse and neglect to assign the referral to an
*(Fn. is continued on the next page.)*

4

In August 2020, Mother purportedly went to Dominic's house at 1:00 a.m. and assaulted him, yelling: "'Why do you have my daughter in your mouth, [k]eep my daughter out your mouth [*sic*].'"

## B.    *DCFS Investigates a Referral*

On September 27, 2020, DCFS received an immediate response referral, alleging that Mother had just given birth to Athena, and had tested positive for opiates and amphetamines.  Mother denied using amphetamines, but admitted that the previous day she had used cocaine and taken Norco.  Mother claimed she had not known she was pregnant.

The next day, a children's social worker (CSW) confirmed the allegations with the reporting party, who added that Mother had tested negative for cocaine, and had stated she took her grandfather's Norco pill due to back pain. Mother had told hospital staff that her name was Alexandra M., and that she had no other children.[3]  After giving birth, Mother checked out of the hospital at 12:55 a.m., claiming she needed to go care for her grandfather who suffered from dementia; Athena remained at the hospital.  Athena subsequently tested positive for methamphetamines, and hospital records indicated she was "prenatally drug exposed," which caused her to develop "'an episode of apnea

_____

investigation."  (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1149, fn. 4.)

[3]     Mother's full name is Brittany Alexandra M. B.

at 12 hours of age,'" and required a transfer to the Neonatal Intensive Care Unit (NICU). Athena subsequently received seven days of antibiotic therapy before discharge.

DCFS interviewed Mother, N.G., Harmony, and Dominic. The relevant portions of their interviews are set forth below.

### 1. Mother

The CSW spoke with Mother, who reiterated that she had taken a Norco pill because she was suffering from back pain, and again claimed not to have known she was pregnant. Denying that she had ever used amphetamines, she was unable to explain her positive test result. She admitted to having "snorted powder" while at a gathering with friends two nights earlier, but thought the powder was cocaine; Mother claimed she had been using cocaine since she was 19 or 20 years old, but only "'here and there.'" Mother denied any other drug use, but admitted some light alcohol consumption.

Mother stated she could not care for Athena, as she and Athena's father had not been in a relationship for three months. She reported the two had a "domestic violence relationship," and claimed he had physically struck her, and was emotionally abusive.[4]

---

[4] Gennie T., who helped Mother watch Demi, told the CSW she, too, was aware of domestic violence between Mother and Demi's father.

When asked who currently lived with her, Mother listed only her grandfather and her "niece," Demi, whose mother was someone with a drug problem who lived in Las Vegas; Mother claimed she had cared for Demi for two years. Mother also mentioned her cousin who was visiting from Oregon. During a tour of the home, the CSW noticed a second child's bed in Demi's room that appeared slept in, but both Mother and the cousin denied that another child lived in the home. When the CSW noticed artwork on the walls that appeared to have been done by a child, the cousin stated they were done by Harmony, the child of Mother's brother. As for the "older girl's toys" the CSW observed, "[M]other stated that the maternal uncle would bring over odd things."

Later that day, the CSW learned from the medical social worker that Mother was going to the hospital to have Athena discharged against medical advice, and that Mother was exhibiting "rapid speech." When the CSW spoke with Mother at the hospital, Mother claimed ignorance that Athena had been suffering from breathing issues, finding it suspicious that "all of a sudden" the infant was experiencing complications. Eventually, Mother agreed not to remove Athena from the hospital.

While at the hospital, the CSW encountered a friend of Mother's, who had also just given birth, and had come to see Athena. This friend claimed that both she and Mother had discovered they were pregnant at the same time, and they "always talked about their pregnancy." The friend surmised that Mother may have been in denial due to being in an

abusive relationship. The friend identified Dominic as Athena's father, and opined that Harmony's father was a good person.

### 2. N.G. and Harmony

On September 29, 2020, the CSW visited with Harmony's father, N.G. N.G. reported that he had received a phone call from Mother asking him to not say anything to DCFS, and informing him that she had lied to the hospital "about everything." N.G. opined that Mother was "a huge liar." N.G. also reported that Mother had a drug problem, explaining that she had lost a lot of weight, acted paranoid, and ground her teeth. He claimed Harmony had walked in on Mother smoking something in a pipe, and that Mother would sleep through the day and force Harmony to care for Demi. N.G. also reported that Harmony had seen Mother and Dominic throw things at each other. N.G. claimed Mother was bipolar, but did not take her medication. N.G. was employed, had no mental health issues or domestic violence history, and had no serious criminal record.

The CSW then spoke with eight-year-old Harmony who confirmed she was Mother's child and stated that she had heard Mother and her friend discussing Mother's pregnancy. Harmony claimed Mother yelled at her every day and required her to change and feed Demi. Harmony confirmed that she walked in on Mother smoking "a thing that looks like a water pipe" -- it had a part for Mother's mouth, and connected to a container. Harmony stated she had seen a

cloud of smoke come out of Mother's mouth; the smoke was odorless. Harmony reported that she had heard Mother and Dominic throwing things at each other, and that the last time it occurred, Harmony had cried and yelled at them to stop. Harmony also reported she had heard Mother and Dominic "hitting and smacking each other." Harmony said she liked living with her father, N.G. The CSW observed that N.G's home was "extremely clean and organized," and had working utilities and sufficient food.

### 3.    Dominic

Dominic acknowledged knowing Mother was pregnant with Athena, but did not believe the child was his.[5] Dominic stated that Mother was seeing other people, and in fact asked him to watch Demi when she did so. When the CSW reminded him there was a criminal protective order in place, Dominic stated he would only go to see Demi. In discussing how the protective order came into being, Dominic explained that in 2019, Mother threw a water bottle at him, and he threw it back, hitting her. Mother then called the police. Dominic was arrested and the court ordered him to attend a 52-week domestic violence program. Dominic completed two months of classes, but then lost his job and could not continue. Dominic reported that he was arrested again four months ago because Mother falsely claimed he had assaulted her again. Nevertheless, Dominic was placed on summary

---

[5]    A DNA test later confirmed Dominic was the father.

probation and ordered to attend another 52-week domestic violence program. He confirmed the criminal restraining order was still in effect.[6]

Dominic claimed that Mother was the aggressor in their relationship and recounted the August 2020 incident in which she came to his house at 1:00 a.m. to attack him. She had "rapid speech" and continually accused him of having "'my daughter in your mouth.'" Dominic's mother confirmed the incident, claiming she personally witnessed Mother attacking Dominic, and that she had to spray Mother with a hose to get her to stop. There was security footage of the incident, but the lack of light prevented the CSW from verifying that Mother was the person in the video. Dominic claimed that Mother essentially stalked him, calling him from 15 different phone numbers, showing up at a meeting Dominic had with his friend, and threatening to come over to his house. Dominic stated he did not know if Mother used drugs, but both he and his mother stated it would explain her "bizarre behaviors." Dominic admitted that if he were to drug test, there could be positive results for marijuana and methamphetamine, which he had used "last week."

### C. *DCFS Files a Petition*

On September 30, 2020, the CSW spoke with Mother and observed that she had "extreme rapid speech." The

---

[6] The CSW later confirmed that a second protective order had been issued in September 2020, and would not expire until 2030.

CSW later received a call from the medical social worker, stating Mother was again on her way to the hospital to retrieve Athena against medical advice. In response, DCFS placed a "Hospital Hold" on Athena. The next day, DCFS obtained a removal order and removed Harmony from Mother's care, and Demi from Mother's and Dominic's care. Harmony was placed with N.G., and Demi and Athena were placed with their paternal aunt.

On October 5, 2020, DCFS filed a petition on behalf of Harmony, Demi, and Athena, alleging counts under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), and (j).[7] Counts a-1 and b-3 identically alleged that Mother and Dominic had a history of domestic violence, recounting incidents from July 2018 through August 2020, and claiming Mother failed to enforce a criminal protective order intended to protect her from Dominic, instead permitting Dominic to live with her and have unlimited access to the children. Counts b-1 and j-1 identically alleged that Mother had a 12-year history of substance abuse, and currently abused cocaine, methamphetamine, amphetamine, and opiates, rendering her incapable of caring for her children. DCFS additionally alleged that Mother used drugs during her pregnancy, tested positive on the day Athena was born, and had previously been under the influence of illicit drugs while caring for her children. Counts b-2 and j-2 identically alleged that though Mother knew Dominic had a substance

---

[7] At the time, Athena was known as "Baby Girl M[.]"

11

abuse problem, she permitted him to reside in her home and have unlimited access to the children. Count b-4 alleged Mother had mental and emotional problems that rendered her unable to provide regular care for the children. The court found prima facie evidence to continue the children's detention.

## D.    *DCFS Continues Investigating*

### 1.    Mother

In November 2020, a dependency investigator (DI) asked Mother if she would submit to drug testing that day. Mother stated she would speak with her attorney, and would agree only if the attorney advised her to do so. Mother agreed to drug test the next day; the results were negative.

Two weeks later, the DI interviewed Mother telephonically. When asked about the domestic violence incidents, she discussed several incidents already known to DCFS, but claimed her children were not present during any of them. She later provided photographs of injuries she claimed to have sustained from one such incident. She disputed the allegation that Dominic had "unlimited access" to the children, stating that if he was visiting them, she would leave Demi with Dominic's mother or sister. Mother denied a drug abuse problem, stating she had used cocaine only three times in her life. She admitted one of those times was a few days before Athena's birth, but continued to insist she did not know she was pregnant until she went into active labor. She denied use of methamphetamines or

narcotics, and stated she was willing to undergo random drug testing.[8]  When asked about Harmony's statements regarding her drug use, Mother claimed Harmony was being coached, and speculated that Harmony may have mistaken a perfume bottle for drug paraphernalia.  Mother again tested negative for drugs on December 4, 2020.

Mother confirmed she had been diagnosed with bipolar disorder around 2010-2011, and had been prescribed certain psychotropic drugs which she took only for two weeks; she stopped because she felt the dosage was too high.  She claimed that her psychiatrist subsequently assessed that she no longer needed medication.  She stated she was currently in therapy and had not been prescribed a psychotropic medication.  In a last minute information DCFS provided to the court in December 2020, a CSW noted that Mother often texted "'bizarre things,'" which raised "additional concerns for mother's mental health status," and claimed it was difficult to have a meaningful conversation with Mother because she would "speak[] over" the CSW and become irate. DCFS also noted that the caregiver for Demi and Athena no longer wanted to monitor visits from Mother because Mother "gets upset easily, uses foul language, and has displayed disrespectful behaviors."  When DCFS spoke with Mother, she would become upset and angry when concerns regarding

---

[8]     Mother also insisted that her grandfather's prescribed pills were not "narcotics," and provided DCFS with a medication list to support this.  The list did not contain Norco.

13

the petition's allegations were expressed.  DCFS characterized her behavior as "minimally cooperative."

### 2. N.G.

N.G. reported that when he tried to keep Harmony from Mother due to concerns about her behavior, Mother initiated divorce proceedings and obtained the family law custody order evenly splitting custody.  N.G. elaborated on his previous concerns that Mother was abusing drugs, explaining that in addition to grinding her teeth and acting paranoid, she also was incoherent at times, exhibiting "awkward" or rapid speech.  He reported that Mother's family members would call and ask N.G. to help her.  N.G. also elaborated on Mother's mental health, stating that it was "'still an issue,'" that her emotions would "'run high,'" and that she would enter "'depressive states.'"

### 3. Dominic

Dominic confirmed the August incident in which Mother came to his mother's house to attack him, but denied other incidents of domestic violence.  He claimed that photos Mother had shown the police of injuries purportedly inflicted by him were actually photos of injuries Mother had sustained in a fight with a neighbor.  However, he claimed that it was too expensive for him to go to trial over the criminal charges and so he "'just took the deal.'"  He admitted throwing a water bottle at Mother in April 2019, but claimed she had thrown it at him first.  He stated that the children were usually sleeping during his arguments

with Mother, and that while they may have heard the arguments, they did not see anything. As to Mother's drug use, Dominic professed ignorance, stating he had only seen her use marijuana. However, he reported noticing changes in Mother's behaviors after he moved out of her home, to the point where he asked her, "'what are you on?'" As to Mother's mental health issues, he stated he had never thought about them, but had previously thought Mother needed medication due to being "'crazy.'"

### 4. Harmony

Harmony reiterated her previous statements that Mother and Dominic threw things at each other, and recounted an incident in which they threw beer cans at each other. She stated she would often go into another room when Mother and Dominic would engage in altercations, and she could hear "'the sound of hitting, like my mom throwing stuff.'" She recalled another incident in which Dominic borrowed Mother's car and Mother retaliated by throwing all of Dominic's "DJ stuff" outside. During these arguments, Demi was asleep or in Harmony's room. Harmony also expressed frustration at having to help care for Demi while she was trying to do schoolwork. As to Mother's drug use, she repeated her statements about seeing Mother smoking, and seeing "fog" in Mother's bedroom. She added that the "'tube bottle'" she saw on Mother's dresser was filled with liquid.

15

### E.    *Adjudication and Disposition*

In December 2020, DCFS filed a last minute information containing a screenshot of an electronic conversation between N.G. and an individual named Randy R., whom N.G. identified as Mother's ex-boyfriend.  Randy, who did not regularly communicate with N.G., had reached out to inform him that on November 23, Mother told Randy she had used "synthetic" urine to test clean for drugs and was smoking methamphetamine daily.  N.G. stated he received this message a week before Thanksgiving.  The DI attempted to contact Randy, but did not receive a call back.

Prior to the adjudication hearing, DCFS submitted an amended petition, dismissing count a-1, amending counts b-1, b-4, and j-1 to remove allegations that the children's fathers failed to protect them, and dismissing count b-2 (but not count j-2).  Count b-3 was also amended to allege that Dominic had been convicted of inflicting injury on Mother, and that Mother did not enforce a criminal protective order requiring Dominic to stay away from Mother.  Dominic pled no contest to the amended petition.

Mother was the only witness to testify at the adjudication hearing.  She denied having mental health or drug problems.  She admitted lying to the hospital social worker regarding how many children she had.  She also admitted to giving her name as Alexandra M. but insisted that was in fact her name.

The court then heard argument.  DCFS's counsel asked the court to sustain the amended petition as to Mother,

arguing that the court should credit the evidence of Mother's drug abuse (the hospital's drug test, Harmony's statements, and the report that Mother was buying "clean" urine and smoking methamphetamine daily) over Mother's testimony to the contrary, that Mother and Dominic had been in an ongoing domestic violence relationship and continued to see each other even though a criminal protective order had been issued, and that Mother's erratic behavior also was caused by her mental health issues. The children's counsel joined in the argument made by DCFS's counsel, raising other instances in which Mother deceived DCFS. Mother's counsel asked the court to disregard any information about Athena's positive drug test (claiming she had been unable to obtain it), and additionally argued there had been no evidence the children were harmed by any of Mother's alleged actions. N.G.'s counsel noted that N.G. was no longer named in the petition, and joined in the arguments of DCFS and the children's counsel. Dominic's counsel stated that he had nothing further to add as Dominic and DCFS had come to an agreement.

The court sustained the amended petition as to Mother. The court pointed to the evidence that Mother had disregarded the criminal protective order preventing Dominic from being near her; that Harmony had observed the violence between the two, which impacted her; that Mother tested positive for illicit substances and that Mother's drug abuse was corroborated by statements from Harmony and N.G.; that Mother was not a credible witness;

17

and that Mother's mental health issues were a cause of her erratic behavior, which endangered the children. The court therefore found the children were persons described by Section 300(b)(1) and Section 300(j), and set a disposition hearing for February 2021.

At the disposition hearing, DCFS's counsel asked that Harmony be released to N.G., but that jurisdiction not be terminated. Counsel additionally requested the court remove Demi and Athena from both parents and order them suitably placed. The children's counsel joined the argument as to Demi and Athena, and additionally informed the court it would not object to the termination of jurisdiction over Harmony, if coupled with a family law order placing her with N.G. Mother's counsel opposed removing the children from her, arguing that DCFS had failed to demonstrate they would be in substantial danger in her care, and that there were reasonable means short of removal to protect them, such as unannounced DCFS visits, drug testing, and any additional programs the court believed necessary. Her counsel also argued that there was no evidence Mother abused drugs, and that while using what she believed to be cocaine was a mistake, Mother did not know she was pregnant and potentially harming her child when she did so; in any case, it did not place her children at risk. N.G.'s counsel asked the court to terminate jurisdiction over Harmony, and grant N.G. sole legal and physical custody, pointing out that N.G. was non-offending, and that Harmony

had been in his care since the inception of the case with no issues. Dominic's counsel again made no argument.

On rebuttal, DCFS's counsel informed the court it would not object to terminating jurisdiction over Harmony, stating it had observed Harmony with N.G. for five months and noted no concerns. As for Mother, DCFS's counsel reminded the court that during her testimony, Mother had denied using opiates, and that Mother had not agreed to release her mental health information and so there was no way to know what diagnoses she had recently received.

The court found Harmony to be a dependent of the court, removed her from Mother, placed her with N.G., and terminated jurisdiction over her, finding that the conditions justifying the initial assumption of jurisdiction no longer existed, and were unlikely to reoccur if supervision were withdrawn. N.G. was granted sole physical custody while both parents retained legal custody.[9] After finding Demi and Athena to be dependents of the court, the court removed them from both parents, citing the facts found at the jurisdiction hearing, and finding by clear and convincing evidence that returning them to either parent would place them in substantial danger, and that there were no reasonable means short of removal to protect them. Mother timely appealed.

---

[9] This order was stayed until receipt of the Juvenile Custody Order, which occurred in March 2021.

19

# DISCUSSION

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings." (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) Under a substantial evidence review, "'we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders. Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.'" (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.) "Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

## A. *Substantial Evidence Supports the Assumption of Jurisdiction*

The court assumed jurisdiction under counts b-1, b-3, b-4, j-1, and j-2. Mother contends substantial evidence does not support assuming jurisdiction under any of these counts. As set forth below, we conclude substantial evidence supported the assumption of jurisdiction under counts b-1, b-3, b-4, and j-1, and that Mother has forfeited any challenge to jurisdiction under count j-2.

### 1. Counts b-1 and j-1 (Mother's Substance Abuse)

Mother argues that substantial evidence did not support finding that she had a "12-year history" of substance abuse, that she used "'illicit drugs'" when Harmony and Demi were in her care, or that the children were endangered by any substance abuse. We disagree.

### (a) Drug Abuse

Mother told a CSW she first used cocaine when she was 19 or 20 years old. As she was born in 1989, her drug use began in 2008 or 2009, 11 or 12 years before the petition was filed. Though Mother claimed she used cocaine only "here and there," she snorted what she believed to be cocaine two days before giving birth to Athena, even though an abundance of evidence demonstrated she was fully aware of her pregnancy. Her willingness to endanger Athena by ingesting an illicit drug while pregnant suggests Mother's drug use was more than a casual habit.

Additionally, Harmony reported she saw a "'tube bottle'" on Mother's dresser, saw Mother smoking what appeared to be a water pipe, saw an odorless cloud of smoke exit Mother's mouth, and frequently saw "fog" in Mother's bedroom. Further, though Mother tested negative for drugs, the court had evidence that Mother accomplished this by purchasing "clean" urine while still smoking methamphetamine on a daily basis. Numerous individuals including N.G., Dominic, and DCFS personnel described

21

Mother's "bizarre" behavior and rapid speech. We therefore find that substantial evidence supported a finding that Mother was abusing drugs. Mother's citation to evidence that could support finding she did not abuse drugs is merely an improper request that we reweigh the evidence. (*In re Joaquin C.*, *supra*, 15 Cal.App.5th at 560.)

### (b) Harm to the Children

Mother's use of what she believed to be cocaine two days before giving birth to Athena self-evidently endangered Athena. Athena tested positive for methamphetamines at birth, and her prenatal exposure to the drug caused "'an episode of apnea at 12 hours of age,'" requiring a transfer to the NICU.

Moreover, a child's ingestion of drugs constitutes serious physical harm, and jurisdiction under Section 300(b)(1) is warranted if substantial evidence supported a finding that the parent placed the child at substantial risk of ingesting drugs. (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 825.) *Rocco M.* listed "four distinct ways" in which a parent could place a child at risk of ingesting drugs: "(1) by placing or leaving drugs in a location or locations where they were available to [the child]; (2) by frequent and prolonged absences which created the opportunity for [the child] to ingest the drugs; (3) by neglecting [the child]'s needs in a way which might be reasonably expected to create the kind of emotional and psychological conditions in which substance abuse typically thrives; and (4) by exposing [the child] to her

22

own drug use, thus impliedly approving such conduct and even encouraging him to believe that it is an appropriate or necessary means of coping with life's difficulties." (*Ibid*.)

Here, Harmony personally witnessed Mother use drugs, and knew Mother's "'tube bottle'" was on her dresser. Harmony also complained that she frequently had to stop doing homework to care for Demi because Mother was otherwise occupied. Nothing in the record suggests Mother intended to curtail her drug habit; to the contrary, she refused to acknowledge her drug problem. "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.) On this record, we find the court did not err in assuming jurisdiction based on Mother's substance abuse, because substantial evidence supported a finding that drugs would be "available" to the children, that drugs caused Mother to neglect her children's needs, and that Mother exposed the children to her drug use.[10]

---

[10] Mother's cases to the contrary are distinguishable. (*In re Rebecca C.* (2014) 228 Cal.App.4th 720, 722, 727-728 [court erred in finding children were at risk from Mother's "relapse" into drug use when Mother admitted to the problem and immediately enrolled in and completed substance abuse program]; *In re Drake M.* (2012) 211 Cal.App.4th 754, 767 [court erred in finding jurisdiction due to Father's use of marijuana, absent evidence Father was under the influence when caring for child]; *In re Destiny S.* (2012) 210 Cal.App.4th 999, 1004 [court erred in finding jurisdiction when child had never seen Mother's drug use, and only potential harm was from child occasionally smelling the
*(Fn. is continued on the next page.)*

## 2.    Count b-3 (Domestic Violence)

While Mother admits that she and Dominic engaged in at least five altercations over a three-year period, and that Harmony heard these altercations, Mother objects both to the finding that there was a "history" of domestic violence, and that any such history endangered the children.  We decline to engage in the semantic debate of whether five incidents over three years constitutes a "history."  Instead, we examine whether substantial evidence supported the court's finding that what domestic violence did occur posed a substantial risk to the children.

In *In re Heather A.* (1996) 52 Cal.App.4th 183, our colleagues in Division Three found that five incidents of domestic violence occurring in the same house as the children warranted jurisdiction under Section 300(b)(1) because "domestic violence in the same household where children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.  Such neglect *causes* the risk."  (*Id.* at 194.)  "Domestic violence impacts children even if they are not the ones being physically abused, 'because they see and hear the violence and the screaming.'"  (*In re T.V.* (2013) 217 Cal.App.4th 126, 134.)  We agree.

---

resultant smoke]; *In re David M.* (2005) 134 Cal.App.4th 822, 829 [no evidence Mother's drug use harmed children in any way].)

While Harmony did not see the domestic violence, she was present when it occurred. She stated that when Mother and Dominic began fighting, she would go into another room -- meaning that the fighting started while she was in the same room. She also reported that she would hear Mother and Dominic throwing things at each other, and "hitting and smacking each other." Indeed, the child was so upset by the altercations that she would cry and tell them to stop. It is therefore reasonable to conclude that, as Demi and Athena got older, they, too, would become aware of the violence that was occurring, and that all the children would be at substantial risk of seeing, hearing, and being injured by the domestic violence between Mother and Dominic.

### 3.    Count b-4 (Mental Health)

Though Mother admitted to being diagnosed with bipolar disorder in 2010 or 2011, to having been prescribed psychotropic medication which she stopped taking, and to currently being in therapy, she nevertheless argues that substantial evidence did not support finding that "a 10-year-old self-reported medical diagnosis of bipolar rendered Mother unable to provide regular care for her children."

In fact, there was more. The evidence demonstrated that Mother's mental health issues persisted beyond her earlier diagnosis. N.G. reported that Mother's mental health was "'still an issue'"; her emotions would "'run high'" and she would enter "'depressive states.'" Dominic characterized Mother's behavior as "'crazy'" and requiring medication.

25

DCFS personnel commented on Mother's rapid speech, "bizarre" texts, and erratic behavior.

Mother's behavior throughout the case was also worrisome. She had gone to Dominic's house in the middle of the night to attack him, yelling about Dominic having her daughter in his mouth. In her initial contact with DCFS, she pretended that Demi and Harmony were her nieces, not her daughters. Hours after giving birth to Athena, Mother checked out of the hospital in the middle of the night, leaving Athena there. And most troubling, Mother tried twice to have Athena discharged against medical advice, requiring DCFS to place a "Hospital Hold" to protect the infant. On this record, we find the court did not err in concluding that Mother's mental health issues placed her children at substantial risk of harm.

### 4. Count j-2 (Failure to Protect from Dominic's Substance Abuse)

Mother argues the court erroneously assumed jurisdiction under count j-2 because "[t]he purported factual basis" for counts j-1 and j-2 was "simply a restatement of the 300(b) allegations set forth above and does not support the jurisdictional finding." To the extent Mother intends to incorporate her challenges to counts b-1, b-3, and b-4, we note that count j-2 was a restatement of dismissed count b-2,

26

which Mother does not address on appeal.[11]  Moreover, as set forth above, we have rejected her arguments that the court erred in taking jurisdiction under counts b-1, b-3, and b-4.  If Mother seeks to raise an independent challenge to count j-2, she has failed to develop this argument, and we find it forfeited.  (See, e.g., *WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 ["we may disregard conclusory arguments that are not supported by pertinent legal authority"]; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["We are not required to examine undeveloped claims or to supply arguments for the litigants"].)

### B.    *Substantial Evidence Supports the Removal of the Children from Mother*

Mother argues that substantial evidence fails to support the finding that the children would have been at substantial risk of harm if returned to her care.  She notes that she had tested negative for drugs, that any visits between Dominic and the children were already monitored by DCFS, and that she had completed a parenting class and a domestic violence class.  She further argues the court erred by not considering reasonable alternatives to removal, such as ordering her to drug test, ordering that Dominic not

---

[11]    Counts b-2 and j-2 alleged that Dominic had a history of substance abuse and had cared for the children while under the influence, and that Mother knew of this problem but nevertheless permitted Dominic to live with and care for the children.

27

reside with her, and ordering that any visitation with Dominic take place in a monitored setting at DCFS.

As discussed above, substantial evidence supported the finding that Mother's actions placed the children at substantial risk of harm. Even with the heightened standard by which the court made findings at the disposition hearing, we find the same evidence supported its conclusions. Mother's citation to potentially contrary evidence is again an improper request that we reweigh the evidence. (*In re Joaquin C.*, *supra*, 15 Cal.App.5th at 560.)

Substantial evidence similarly supported the court's determination that there were no reasonable means by which removal could have been avoided. As discussed above, not only did the court find Mother's testimony regarding her drug use not credible, there was also substantial evidence that Mother was cheating on her drug tests using purchased urine. Therefore, the court reasonably could have concluded that ordering Mother to drug test would neither ensure she was not abusing drugs, nor prevent her from storing drugs in locations accessible to the children. Moreover, Mother's actions throughout the DCFS investigation were replete with deception, and she admittedly disregarded a criminal protective order intended to keep her and Dominic apart. DCFS characterized her behavior as "minimally cooperative." The court had no reason to believe Mother would obey an order that she and the children refrain from visiting Dominic in an unmonitored setting. We conclude the court did not err in failing to consider alternative means.

### C. *The Court Did Not Err in Awarding N.G. Sole Physical Custody of Harmony*

Mother contends it was an abuse of discretion to award sole physical custody of Harmony to N.G. based on her failure to make sufficient progress in programs that the court had just ordered Mother to attend. We reject the premise of Mother's argument. Nothing in the record indicates the court awarded sole physical custody to N.G. due to insufficient progress in court-ordered programs.[12] Nor do we discern an abuse of discretion -- it is undisputed that N.G. was a non-offending parent, that Harmony stated she was happy living with him, and that DCFS noted no concerns with his parenting of Harmony and did not object to the court awarding him sole physical custody. Furthermore, as discussed above, the court had just concluded that Harmony would be at substantial risk if released to Mother. We therefore find reasonable the court's decision to award sole physical custody of Harmony to N.G.

---

[12] The court ordered that Mother's visitations with Harmony be monitored because she had not made substantial progress in court-ordered programs, but Mother does not contend the court erred in ordering monitored visitation.

## DISPOSITION

The court's orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

COLLINS, J.

CURREY, J.